# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOEL PETEFISH, SR., | ) | CASE NO. 4:13-cv-01295 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| MAGGIE BRADSHAW, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner Joel Petefish, Sr. ("Petefish"), challenges the constitutionality of his conviction in the case of *State v. Petefish*, Mahoning County Court of Common Pleas Case No. 2010-CR-00023.  Petefish, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on June 12, 2013.  On October 23, 2013, Warden Maggie Bradshaw ("Respondent") filed her Answer/Return of Writ.  (ECF No. 6.)  Petefish filed a Traverse on December 13, 2013.  (ECF No. 8)  For reasons set forth in detail below, it is recommended that Petefish's petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts

underlying Petefish's conviction as follows:

[*P2]  Appellant had been married to Bette and the two had a son, Joel, Jr. They divorced in the early nineties. After the divorce Bette remarried and had a daughter, Melissa.  Bette and her husband Steven lived together with both children, Joel, Jr. and Melissa. Appellant moved to Georgia during the early nineties and lived there for approximately twenty years. (Tr. Vol. III, p. 506.)  In the late summer of 2009, he made his way north from Georgia, staying with family along the way. (Tr. Vol. III, pp. 494-495.)  When he returned to the Youngstown area his father refused to allow him to stay in the family home. Appellant's mother contacted his ex-wife, Bette, told her he had nowhere to stay other than to camp in the woods, and asked if she could help.  Bette agreed to let Appellant wash, eat, and nap from time to time, depending on his behavior and the weather, first at the townhouse she shared with her husband, and later in the one-bedroom apartment she and her daughter shared.  (Tr. Vol. II, p. 343.)  Bette would ask Appellant to leave if his behavior was inappropriate or if he was using alcohol or drugs.  (Tr. Vol. II, pp. 345-346.)

[*P3]  During October of 2009, Bette and Steven began a trial separation.  (Tr. Vol. II, p. 342.)  Bette and her daughter moved to a separate apartment, but Steven continued to pay for their groceries and upkeep, and set up their phone and cable. (Tr. Vol. II, pp. 369, 371, 382.)  Bette's apartment had only one set of keys, which she kept. She, alone, was listed on the lease, and paid rent herself.  (Tr. Vol. II, p. 375-376.)  Appellant continued to stay with Bette and her daughter at the apartment, either several times a week, according to Bette and Melissa, or continuously, according to Appellant.  (Tr. Vols. II & III, pp. 370, 414; cf. 512)  In December, Bette decided to tell Appellant to get a job and leave. (Tr. Vol. II, pp. 345, 381.)  It appears Appellant left when she asked, but continued to return periodically during December.

[*P4]  During the day on December 24, 2009, Bette left the apartment unlocked, as was her practice, so her son, Joel, Jr., could come in to pick up his Christmas present.  (Tr. Vol. II, pp. 351-352; 376-377.)  Bette testified that she returned to her apartment and found Appellant there: he had her "daughter's Kool-Aid all over his face, and ran outside and did these snow angels and urinated on them."  Bette stated that she was upset by his presence and his behavior, and told him to leave.  (Tr. Vol. II, pp. 381, 387; 347-348.)  Bette prepared to pick up her daughter and go to her parents' house for the holiday.  Bette and Appellant agreed that he would drop by the gathering so she could take him to his mother's house before she and her daughter continued to her husband's house to celebrate Christmas.  (Tr. Vol. II, p. 349.)  Appellant never arrived at her parents' party. Instead, when Bette and Melissa stopped at the apartment on their way to Steven's, they were surprised by Appellant, who was drunk.  The apartment was in disarray.  Clothing was strewn everywhere, soda and alcohol were spilled on

-2-

the floor and on the dining room table, food was left either raw on the counter or burning in the oven.  (Tr. Vols. II & III, pp. 350; 399-400.)  Bette told Appellant, again, that he had to leave.  Appellant started "ranting and raging."  (Tr. Vol. II, p. 351.)  Appellant remained while Bette and her daughter prepared to leave.  Finally Melissa offered him a few dollars and he left.  (Tr. Vol. III, pp. 400; 407.)

[*P5]  Shortly after Appellant left with her money, Melissa tried to make a phone call and discovered the house phone was disconnected.  The landline was digital and neither Melissa nor Bette knew how to set it back up.  They realized then that Melissa's cell phone was missing.  They concluded that Appellant had taken the phone and headed toward the door to borrow a neighbor's phone.  (Tr. Vol. II & III, pp. 352-354; 411.)  As Bette reached the door there was a knock.  She saw Appellant through the peep hole and asked him, through the door, for her daughter's phone.  He held it up and said she had to open the door so he could hand it to her.  She cracked the door open and, rather than pass her the phone, Appellant pushed the door more fully open, forcing the two women into the wall as he entered the apartment.  He began mumbling and yelling and screaming.  When Bette told him they were leaving and he also needed to leave, Appellant responded "[y]ou're not going anywhere."  (Tr. Vol. II, pp. 355-357.)  The two women observed Appellant enter the kitchen area, take two knives and put them in the pockets of his pants.  (Tr. Vols. II & III, pp. 356; 402.)

[*P6]  Bette and her daughter ran to the bedroom.  As the two were hurrying away from Appellant, Melissa, to whom Appellant had thrown the cell phone, pretended to call her grandparents while actually calling her father.  Under the guise of telling her grandmother they had made it home safely, she conveyed to her father that he needed to call the police.  (Tr. Vol. III, p. 403.)  As the two entered the bedroom, Bette told Melissa to pack a bag, but Appellant broke into the bedroom and stood over the two women "calling us names and said you're not going anywhere.  I'm not going to allow you.  You're not going anywhere."  (Tr. Vol. II, p. 357.)  While Appellant, who was apparently drunk, alternated between standing over the women and standing in the doorway shouting at them, he frequently put his hands in his pockets.  Both women were very aware that the knives were in his pockets and were afraid that he was going to use the knives to hurt them.  (Tr. Vol. II & III, pp. 385-386; 403-405.)  Bette continually asked Appellant to leave, to leave her daughter alone, and never come back.  (Tr. Vol. II, p. 358.)  Because the apartment was on the third floor there was no exit other than the front door.

[*P7]  Suddenly, something appeared to distract Appellant in the kitchen, and he left the bedroom.  (Tr. Vol. II, p. 384.)  Bette took her daughter's arm and the two ran to the front door, reaching for her keys from a table as they ran past.  (Tr. Vol. II, 359-360.)  The two jumped into the car and drove down the street.

-3-

[*P8]  Bette and Melissa waited in a parking lot down the block for the police to arrive.  After several cruisers arrived, they returned to the apartment.  Meeting Officer Asad Chaibi, they gave statements at the scene.  The first officer to arrive on the scene found the apartment a mess with a single chair oddly placed in the center of the living room.  Fearing for his safety, the officer secured Appellant on the chair while waiting for back-up.  (Tr. Vol. III, pp. 426; 440; 459.)  All of the officers involved noted how shaken the women were; that they were reluctant to leave their car and then reluctant to have to see Appellant again at the hearing seeking a restraining order. (Tr. Vol. III, pp. 429; 441; 447; 464.)

[*P9]  At trial, Appellant testified that the events described by Bette and her daughter never happened.  He stated that he never threatened them or prevented them from leaving.  He maintained that he returned to the Youngstown area because Bette asked him to and to be with his son.  He testified that Bette and he were in an intimate relationship and they moved into the apartment together, and that he regularly contributed to the household and spent more nights in the apartment than Melissa did.  Appellant testified that Melissa was upset by the obvious relationship he had with her mother, that she always had a problem with him, and that the police were called that night due to a family disagreement after Melissa became upset when he asked her mother for a kiss.  (Tr. Vol. III, pp. 509-510, 515, 518, 530-531.)  Bette denied any sexual relationship with Appellant.  (Tr. Vol. II, p. 363.)  She said that she and her daughter shared the single bedroom in the apartment.  (Tr. Vol. II., p. 342.)

[*P10]  Appellant was indicted by the grand jury on January 28, 2010. Count one was for burglary, a violation of R.C. 2911.11(A)(2)(B), a first degree felony.  Counts two and three charged abduction, violations of R.C. 2905.02(A)(2)(C); count two was for the abduction of Bette, count three was for the abduction of Melissa, both third degree felonies.  Appellant did not waive his speedy trial rights.  Trial was initially set for early April, but Appellant requested and received a continuance.  The jury trial commenced on April 19, 2010 and continued through April 22, 2010.  Bette and Melissa testified for the state; as well as responding Officers Chaibi, Ditullio, Moran, and Quinn.  Detective Lodwick, of the child and family crimes division, also testified.  Appellant and his mother testified for the defense.

[*P11]  The defense moved for acquittal on the merits at the conclusion of the state's case-in-chief.  The motion was overruled.

*State v. Petefish*, 2011 Ohio App. LEXIS 5238, 2011-Ohio-6367 (Ohio Ct. App., Dec. 7, 2011).

## II.  Procedural History

### A.    Conviction

In January of 2010, a Mahoning County Grand Jury charged Petefish with one count of aggravated burglary in violation of Ohio Revised Code ("O.R.C.") § 2911.11(A)(2), and two counts of abduction in violation of O.R.C. § 2905.02(A)(2).  (ECF No. 6, Exh. 2.)  On April 22, 2010, a jury found Petefish guilty as charged.  (ECF No. 6, Exhs. 3 & 8.)  On May 7, 2010, Petefish was sentenced to consecutive prison terms of six years for the burglary conviction and four years for the merged abduction convictions.  (ECF No. 6-11, Exh. 8.)

### B.    Direct Appeal

On May 10, 2010, Petefish, through trial counsel, filed a Notice of Appeal with the Court of Appeals for the Seventh Appellate District ("state appellate court").  (ECF No. 6-12, Exh. 9.) Thereafter, Petefish, represented by new counsel, raised the following assignments of error:

> 1.    The State of Ohio failed to introduce sufficient evidence to prove beyond a reasonable doubt that defendant-appellant, Joel Petefish, committed aggravated burglary and abduction.
>
> 2.    The Jury verdict finding defendant-appellant, Mr. Petefish, guilty of aggravated burglary and abduction is against the manifest weight of the evidence.

(ECF No. 6-14, Exh. 11.)

On December 7, 2011, Petefish's conviction was affirmed.  (ECF No. 6-1, Exh. 1.)

On January 10, 2012, Petefish, *pro se*, filed a Notice of Appeal with the Supreme Court of Ohio.  (ECF No. 6-18, Exh. 15.)  As propositions of law, Petefish raised the same issues as in the court below.  (ECF No. 6-20, Exh. 17.)  On April 4, 2012, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 6-21, Exh. 18.)

**C.    Post-Conviction Relief**

On January 13, 2011, while his direct appeal was pending, Petefish, *pro se*, filed a petition

for post-conviction relief raising the following claims:

1.    The  Petitioner was substantially prejudiced and denied his right to effective
assistance of counsel by trial counsel's failure to properly investigate and/or
interview State or defense witnesses in order to adequately prepare a defense
and prepare for trial.

2.    The Petitioner was substantially  prejudiced and denied his right to effective
assistance of counsel by trial counsel's failure to follow through and call
witnesses that would have refuted and defeated the inflammatory evidence
presented to and considered by the jury.

3.    The Petitioner was substantially prejudiced and denied his right to effective
assistance of counsel by trial counsel's failure to disclose a newly diagnosed
medical condition (diabetes) for which his treatment was causing unusual
reactions such as falling asleep, lethargy, apathy, and malaise, during
petitioner's trial.

(ECF No. 6-22, Exh. 19.)

On March 16, 2011, the State filed a motion for summary judgment.  (ECF No. 6-23, Exh.

20.)  On April 11, 2011, the trial court found the State's motion for summary judgment to be

well-taken and denied Petefish's petition without further elaboration.  (ECF No. 6-26, Exh. 23.)

On May 5, 2011, Petefish, *pro se*, filed an appeal raising one assignment of error:

"Appellant is entitled to findings of fact and conclusions of law on his timely post-conviction

Petition otherwise due process is violated as protected by the United States and Ohio

Constitutions."  (ECF No. 6-29, Exh. 26.)  The State filed a motion requesting a limited remand.

(ECF No. 6-30, Exh. 27.)

On August 15, 2011, the appellate court issued an order holding the appeal in abeyance for

30 days and remanding the matter to the common pleas court "for the limited purpose of filing

-6-

findings of fact and conclusions of law" in conjunction with its April 2011 judgment entry. (ECF No. 6-31, Exh. 28.)  On August 23, 2011 and again on September 9, 2011, the trial court issued amended judgment entries that contained findings of fact and conclusions of law.  (ECF No. 6-33, Exh. 30.)

On October 5, 2011, Petefish, *pro se*, filed an appeal from the common pleas court's September 9, 2011 decision.  (ECF No. 6-35, Exh. 32.)  On October 21, 2011, the state appellate court consolidated this appeal with the earlier appeal that was held in abeyance.[1]  (ECF No. 6-36, Exh. 33.)

On December 13, 2011, Petefish, *pro se*, filed his brief in support raising the following assignments of error:

    1.    The appellant was substantially prejudiced and denied his right to effective assistance of counsel by trial counsel's failure to properly investigate and/or interview State [or] defense witnesses in order to adequately prepare a defense and prepare for trial.

    2.    The appellant submits he was substantially prejudiced and denied his right to effective assistance of counsel by trial counsel's failure to follow through and call witnesses that would have refuted and defeated the inflammatory evidence presented to and considered by the jury.

    3.    The appellant submits he was substantially prejudiced and denied his right to effective assistance of counsel by trial counsel's failure to disclose a newly diagnosed medical condition (diabetes) for which his treatment was causing unusual reactions such as falling asleep, lethargy, apathy and malaise, during petitioner's trial.

(ECF No. 6-40, Exh. 37.)

---

[1]  Petefish filed a motion for reconsideration from the state appellate court's decision to consolidate his appeals, which was denied.  (ECF No. 6, Exhs. 34 & 35.)  The state appellate court noted that Petefish "may raise any issue for review in his brief to be filed in" the consolidated appeal.  (ECF No. 6-38, Exh. 35.)

On March 30, 2012, the state appellate court affirmed the trial court's judgment, and indicated that the trial judge had not abused his discretion by determining a hearing was unnecessary.  (ECF No. 6-41, Exh. 38.)

On April 26, 2012, Petefish, *pro se*, filed an appeal with the Supreme Court of Ohio, raising the same assignments of error as below.  (ECF No. 6, Exhs. 41 & 42.)

On July 5, 2012, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 6-46, Exh. 43.)

**D.  Application to Reopen**

While his direct appeal and post-conviction petition appeals were pending, Petefish, *pro se*, filed an application to reopen his appeal pursuant to Ohio Appellate Rule 26(B) on January 18, 2012.  (ECF No. 6-47, Exh. 44.)  He raised one assignment of error:

> 1.  Appellant was prejudiced when he was deprived of his right to effective assistance of counsel, when counsel failed to raise the issue of appellant's void sentence due to an improper failure to merge the counts which are-were allied offenses.

(ECF No. 6-47, Exh. 44.)

On June 13, 2012, the state appellate court denied his application to reopen, finding that Petefish received effective assistance of appellate counsel as there was no reasonable probability of success with respect to the contention that Petefish was convicted of allied offenses.  (ECF No. 6-50, Exh. 47.)

On July 9, 2012, Petefish, *pro se*, filed an appeal with the Supreme Court of Ohio raising the same argument as before the court below.  (ECF No. 6, Exhs. 49 & 50.)  On September 26, 2012, the appeal was dismissed as not involving any substantial constitutional question.  (ECF No. 6-54, Exh. 51.)

-8-

On December 13, 2012, Petefish, *pro se*, filed a petition for a writ of certiorari with the Supreme Court of the United States.  (ECF No. 6-55, Exh. 52.)  On February 19, 2013, the petition was denied.  (ECF No. 6-57, Exh. 54.)

**E.    Federal Habeas Petition**

On June 12, 2013, Petefish filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

> GROUND ONE: The State of Ohio failed to introduce sufficient evidence to prove beyond a reasonable doubt Petitioner committed Aggravated Burglary and Abduction.

> GROUND TWO: Petitioner was denied his right to effective assistance of counsel who failed to investigate or call witnesses who would have refuted and exonerated Petitioner.

> GROUND THREE:  Petitioner was prejudiced by trial counsel's failure to stay awake during the trial effectively leaving him un-represented during critical stages of trial.

> GROUND FOUR: Petitioner was deprived of the effective assistance of counsel on Appeal when he failed to raise structural error on merger of allied offenses.

(ECF No. 1.)

### III.  Review on the Merits[2]

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any

---

[2]  The Respondent has not argued that the petition contains unexhausted or procedurally defaulted claims.  (ECF No. 6.)  As such, the Court proceeds directly to the merits of the petition.

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings of the United States Supreme Court.  *See Parker v. Matthews,* 132 S. Ct. 2148, 2012 WL 2076341, *6 (U.S. Jun. 11, 2012); *Renico v Lett,* 559 U.S. –, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  However, an explicit statement by the Supreme Court is not mandatory; rather, "the legal principles and standards flowing from [Supreme Court] precedent" also qualify as "clearly established law." *Ruimveld*, 404 F.3d at 1010 (*quoting Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002))  The Supreme Court has indicated, however, that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Parker*, 2012 WL 2076341, *6; *Howes v. Walker,* 132 S.Ct. 2741, 2012 WL 508160 (2012).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

-10-

unreasonably applies that principle to the facts of the prisoner's case." *Id.*  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 Fed. Appx. 511, 516 (6th Cir. 2006) (*citing Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, ⸺ U.S. ⸺, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 785.  The Court noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.")

**A. Ground One: Sufficiency of the Evidence**

In his first ground for relief, Petefish asserts that the State failed to introduce sufficient evidence to prove beyond a reasonable doubt that he committed the crimes of aggravated burglary and abduction.  (ECF No. 1.)  Before the state appellate court, Petefish also argued that his convictions were against the manifest weight of the evidence.  Manifest weight claims are not, however, cognizable upon habeas review.[3]  The state appellate court addressed Petefish's assignment of error as follows:

> [*P15]  Appellant's two assignments of error challenge the sufficiency and the manifest weight of the evidence; because the facts and testimony concerned in each assignment are identical the two assignments will be addressed together.
>
> [*P16]  A challenge to the sufficiency of the evidence tests whether the state has properly discharged its burden to produce competent, probative, evidence on each element of the offense charged.  An inquiry into sufficiency focuses on whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime proven beyond a reasonable doubt.  *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E. 2d 492, paragraph two of the syllabus.  In contrast, a challenge to the manifest weight of the evidence addresses not the mere existence of evidence on each element, but the effect of that evidence in inducing belief.  *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541.

> * * *

---

[3]  As explained by the U.S. District for the Southern District of Ohio, "under Ohio law, a claim that a verdict was against the manifest weight of the evidence-as opposed to one based upon insufficient evidence-requires the appellate court to act as a 'thirteenth juror' and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether 'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Hess v. Eberlin*, 2006 U.S. Dist. LEXIS 99990, 2006 WL 2090093 at *7 (S.D. Ohio 2006), *quoting State v. Martin*, 20 Ohio App. 3d 172, 20 Ohio B. 215, 485 N.E.2d 717 (Ohio Ct. App. 1983). Because a federal district court does "not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review," this Court cannot consider whether Petefish's conviction was against the manifest weight of the evidence. *Id.*

[*P17]  In this case Appellant was charged on three counts. The first count constituted a violation of 2911.11(A)(2)(B), aggravated burglary, by trespassing in an occupied structure as defined by R.C. 2909.01(C), while in possession of a deadly weapon or ordnance in violation of R.C. 2923.11, a first degree felony. The second and third counts are violations of R.C. 2905.02(A)(2)(C), abduction: one count with regard to Bette, and one count with regard to Melissa, a minor, both third degree felonies.

[*P18]  Ohio Revised Code Section 2911.11 reads in pertinent part: "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply * * * (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."  Pursuant to R.C. 2923.11, a deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."  Finally, R.C. 2905.02(A)(2) and (C) provide, in part: "No person, without privilege to do so, shall knowingly do any of the following: * * * (2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear; * * * (C) Whoever violates this section is guilty of abduction, a felony of the third degree."

(A) Sufficiency of the Evidence

[*P19]  Appellant attacks the sufficiency of the evidence with regard to two elements of the burglary charge, trespass and use/possession of a deadly weapon, and on the restraint element of the abduction charge.

(1) Trespass

[*P20]  Appellant's argument that the state failed to present sufficient evidence establishing the trespass element of burglary rests on the fact that his testimony conflicts with testimony of other witnesses concerning the extent of his privileges in Bette's apartment.  It is undisputed that over the years since the end of their marriage Bette sometimes allowed Appellant to sleep in her place of residence. Bette also allowed Appellant to shower and eat when necessary, and to store some seasonal possessions, e.g. golf clubs, that he was unable to carry with him.  It is equally undisputed that Bette required Appellant to follow rules, including abstaining from alcohol, when he stayed with her, and that he was required to leave when she asked.  The parties also agree that the apartment is an occupied structure; that Appellant's name does not appear on the lease; that Appellant does not pay rent, utilities, or make regular contributions to the household; and that

-13-

Appellant does not have his own set of keys and is unable to come and go without making prior arrangements with Bette.  Appellant admits he receives mail at his mother's house, not the apartment.  The record also reflects that he sleeps in a variety of places other than the apartment, including the woods.

[*P21]  Bette testified that on the day of the incident she told Appellant he had to leave and left the apartment with her daughter for a family party.  When Bette and her daughter returned to the apartment expecting it to be empty, they instead found Appellant, drunk, and the apartment in disarray.  Bette told Appellant to leave, he became angry, and initially left, taking her daughter's cell phone with him.  Appellant returned almost immediately, pushed his way into the apartment, picked up two knives, refused to leave, and prevented Bette and her daughter from leaving.

[*P22]  As we have previously noted, "[a] trespass may occur even after lawful entry onto the premise if the privilege to remain on the premises has been terminated or revoked."  *State v. Keyes*, 7th Dist. Case No. 08 CO 11, 2008 Ohio 6592 ¶24 (finding the quoted instruction concerning revocation proper.)  Even where a revocation of a privilege is not explicit, the termination of the privilege to remain may be inferred. *State v. Steffen* (1987), 31 Ohio St.3d 111, 115, 31 Ohio B. 273, 509 N.E.2d 383. ("Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in [the victim's] home terminated the moment he commenced his assault on her.")  Here, as in *Keyes*, there was an actual revocation of privilege and there is no need to resort to inference of revocation. *See State v. Morton*, 147 Ohio App.3d 43, 2002 Ohio 813, 768 N.E.2d 730, ¶38, 51. The fact that Appellant was allowed to store property in the apartment, had conditional privileges within the property, and may have hung pictures for Bette or performed other minimal maintenance does not alter her ability to verbally terminate any privilege to remain.  The instruction given the jury on the trespass element, without objection, was that "[a] spouse may be criminally liable for trespass and/or burglary in the dwelling of the other spouse who is exercising custody or control over that dwelling."  (Tr. Vol. III, p. 622.)

[*P23]  Appellant cites *Radvansky v. City of Olmstead Falls*, 2005 Fed. App. 0024P, 395 Fed. 3d 291 (6th Cir. 2005) for the proposition that a tenant cannot be prosecuted for trespassing in the leased property, in support of his argument. Radvansky addresses a situation where a tenant was arrested and indicted without probable cause.  Mr. Radvansky had a verbal rental agreement whereby he paid $450 a month to share the common areas of a house, excluding his separate locked bedroom, with the homeowner.  Mr. Radvansky was current through April, but $60 dollars short on his May rent.  While he was out of town in early May, the owner changed the locks.  When he returned to the property he made multiple attempts to enter and retrieve property.

-14-

[*P24]  On Mr. Radvansky's third attempt he broke a window and screen to crawl into the house.  A neighbor saw him and called the police who responded to a burglary in progress.  Mr. Radvansky was arrested on the premises, "[d]espite the officers' pre-existing knowledge that he was currently involved in a dispute with his landlord, his repeated protestations that he lived there, undisputed documentary evidence which supported his claim [including his mail to that address], and the presence of his personal property, clothing and furnishings within the house."  *Id*. at 296; *see also* 300-301; 304; 307.  The Sixth Circuit found that a month-to-month tenancy had been created by payment and acceptance of rent, and that under the circumstances the information relied on by the arresting officers did not constitute probable cause.  *Id*. at 304.  The fact that Mr. Radvansky was a bona fide rent-paying tenant was dispositive.

[*P25]  None of the circumstances and indicia that supported Mr. Radvansky's claim of tenancy exist in the matter at bar.  Appellant has failed to establish any legal right to the property that would prevent Bette's testimony from establishing the elements of trespass.  The jury was instructed on the elements of trespass and the testimony at trial addresses those elements.  Appellant's argument as to the credibility of Bette's testimony and the fact that his own testimony differs is relevant only to the weight of that testimony, not the question of whether it is sufficient to establish the elements of the offense.  We hold that the state's evidence is sufficient as to the trespass element.

(2) Deadly weapon.

[*P26]  Appellant makes two arguments concerning the element regarding his deadly weapons charge.  First, Appellant concedes that he placed two knives in his pockets, but argues that the knives are not in and of themselves deadly weapons.  Appellant's argument is without merit.  State's exhibit two clearly indicates Appellant had two knives, one in his back right pocket and the second labeled: "FROM HIS RIGHT CARGO POCKET, A SWITCHBLADE WITH A CLIP VISIBLE." (State's Exh. 2, p. 2.)  As detailed below, a switchblade is a deadly weapon within the meaning of R.C. 2911.11, because although not all knives are automatically classified as weapons, the fact that a switchblade is spring mounted and may be deployed with one hand places it in the category of "any instrument * * * designed or specially adapted for use as a weapon."  R.C. 2923.11.

In determining the types of knives that constitute deadly weapons, a number of courts have found R.C. 2923.20 instructive.  The code section, captioned: "Unlawful transactions in weapons," prohibits the manufacture of, possession of, and sale or furnishing "to any person other than a law enforcement agency for authorized use in police work, any brass knuckles, cestus, billy, blackjack, sandbag, switchblade knife, springblade knife, gravity knife, or similar weapon."

-15-

R.C. 2923.20. (*See, e.g. In re Gochneaur*, 11th Dist. No. 2007-A-0089, 2008 Ohio 3987, ¶19, where the court, citing the statute, concluded "knives opening easily with one hand may be considered (for obvious reasons), as being designed or adapted for use as weapons." *See also, State v. Cattledge*, 10th Dist. No. 10AP-105, 2010 Ohio 4953, inter alia).

[*P28]  Several other appellate courts have found that switchblades are weapons *per se*.  A switchblade knife, by virtue of its spring-loaded action, is by definition adapted for use as a weapon.  *State v. Johnson*, 8th Dist. No. 81299, 2003 Ohio 4177, at ¶23 (where the knife was "a pocket knife which required both hands to open" and "not a switch blade," the state had to present evidence that it was designed or adapted for use as a weapon); *see also State v. Mullins* (Dec. 2, 1981), 1st Dist. No. C-810093, 1981 Ohio App. LEXIS 12578, 1981 WL 10140 at *4-5  (the fact that "a switchblade knife can be used as a toothpick" does not remove it from the statutory category of "designed or specifically adapted for use as a weapon"); and former R.C. 2923.021 (prohibiting possession of 'any knife fitted with a mechanical device for automatic release of the blade, opening the knife and locking the knife in the open position, commonly known as a switch or automatic spring knife')," as well as *State v. Totarella*, 11th Dist. No. 2002-L-147, 2004 Ohio 1175, ¶60 (in which the court also found that a switchblade was a deadly weapon).

[*P29]  It appears that no court in the state has determined that a switchblade is not a weapon. In fact, some courts have held that switchblades are, *per se*, deadly. The court in *State v. Orlett* (1975), 44 Ohio Misc. 7, 335 N.E.2d 894 elaborated: "It is further acknowledged that some weapons are *per se* deadly.  Others, owing to the manner in which they are used, become deadly.  A gun, pistol or switchblade knife are *per se* deadly.  Other weapons can become deadly and assume deadly character depending upon the manner and circumstances of their use.  There is a question of fact presented  in such cases and where such a question exists, the fact must be resolved by either the jury or the court.  In determining whether an instrument not inherently 'deadly' or dangerous assumes these characteristics, the court may consider the nature of the weapon, the manner of its use, the actions of the user, the intent and the mind of the user and the capability of the instrument to inflict death or serious bodily harm." *Id*. at 9.  *See also State v. Ash*, (May 3, 1979), 8th Dist. No. 38808, 1979 Ohio App. LEXIS 8628 ("For purposes of R.C. 2923.11(A), there are two types of weapons: those which are per se deadly, such as a gun, pistol, or switchblade knife; and those which can become deadly and assume deadly character depending upon the manner and circumstances of their use.")  The presence of a switchblade in a jacket pocket is sufficient to support a conviction for concealing a deadly weapon in violation of R.C. 2923.12.  *State v. Simpson* (May 21, 1985), 1st Dist. No. C-840597, 1985 Ohio App. LEXIS 6676.

[*P30]  Appellant never disputes that one of the two knives in question is a switchblade.  In fact, Appellant never mentions or addresses that detail, instead repeatedly referring to it as a "pocket knife" and maintaining that a pocket knife is not a weapon.  Appellant relies on *State v. Cathel* (1998), 127 Ohio App.3d 408, 713 N.E.2d 52, mis-citing the case as standing for the proposition that "[c]ircumstances cannot transform a pocket knife into a weapon."  (Appellant's Brf., p. 11.)  The Ninth District's decision actually focused on the fact that although "[t]here is no dispute that the knife in question is capable of inflicting death," the pocket knife in that instance took two hands to open and "was neither a switch or other spring-loaded blade, nor a gravity blade capable of instant one-handed operation, and differs only in its somewhat greater length from the familiar type of clasp knife carried as a useful tool by thousands."  *Id*. at 411, 413 *citing State v. Anderson*, 2 Ohio App.3d 71, 2 Ohio B. 79, 440 N.E.2d 814.  The circumstances to which the court refers are those surrounding the reasons Mr. Cathel was detained by police and his knife discovered.  The *Cathel* court concluded, contrary to Appellant's argument, that although neither hiding from the police in the early morning hours, nor walking down the street in the early morning hours (the reasons the defendant was detained) could convert possession of a folding knife into possession of a deadly weapon, there may exist other circumstances that could.  The fact that the knife Appellant carried, unlike the knives at issue in *Cathel* and *Anderson*, is a switchblade, similar to the knives involved in *Orlett*, *Simpson*, *Ash*, *Totarella*, *Mullins*, *Johnson*, leads us to find that it is a "deadly weapon" within the meaning of R.C. 2911.11(A)(2).

[*P31]  Appellant's second argument concerning the deadly weapon element focuses on the language of R.C. 2911.11(A)(2).  Appellant claims that the statute requires that the deadly weapon actually be used, not merely carried or possessed, during the commission of the crime and that its use must be proved beyond a reasonable doubt.  This conclusion is contrary to the plain language of the statute as well as the very authority cited by Appellant.  The statute reads in the disjunctive.  A violation occurs when "[t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."  R.C. 2911.11(A)(2).

[*P32]  When the statute was revised in 1973 to consolidate ten separate breaking and entering offenses into three, the legislature identified the relative potential for harm as the distinguishing factor among the consolidated offenses.  It is due to the focus on the potential for physical harm that aggravated burglary, which "carries the highest degree of risk that someone may be harmed," "is the most serious of the three breaking and entering offenses in the new code" because it is committed by an offender who possesses or controls a deadly weapon or dangerous ordnance. R.C. 2911.11, LSC Note 1973.  The plain language of the statute tracks the intent of the legislature: the mere possession of a deadly weapon on the person when unlawfully entering an occupied structure increases the risk of harm to

-17-

persons, therefore, it is possession during commission that the enhanced penalty is designed to deter.

[*P33] Possession of a deadly weapon is sufficient to satisfy R.C. 2911.11(A)(2), (B). The fact that Appellant never "brandished" the weapon is irrelevant. Once Appellant has conceded he possessed the knives, the only relevant question is whether the knives in question are "deadly weapons." As discussed above, the fact that one of the two "pocket knives" was, in fact, a switchblade, clearly places the knife in the prohibited category. Hence, the state's evidence is sufficient as to this element.

(3) Abduction.

[*P34] Appellant's only "sufficiency" argument with regard to abduction is to challenge the testimony of Melissa and Bette as "self serving." Questioning the motivations of witnesses does not rise to the level of a sufficiency issue. The relevant inquiry in sufficiency is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. As Appellant's own argument concedes, the state offered probative testimony from both women that he forced his way into the apartment, took a pair of knives, put them in his pockets, then forced his way into the bedroom where they had retreated, stood over them, placed his hands in his pockets where the knives were kept and repeatedly told them they could not leave. (Tr. Vol. II, p. 355.) Bette further testified she thought at the time that he was so drunk and in such a rage that either she or Melissa would be killed. (Tr. Vol. II, p. 357.) The testimony given by Melissa tracks that of her mother. Deputy Chaibi further testified that when the two women met him at the apartment, they were "terrified." (Tr. Vol. III, p. 429.) The record of testimony in this instance does not support a conclusion that the trier of fact lost its way. It is certainly sufficient to establish the elements of the offense.

*State v. Petefish*, 2011-Ohio-6367, 2011 Ohio App. LEXIS 5238 (Ohio Ct. App. Dec. 7, 2011).

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be supported by proof beyond a reasonable doubt with respect to every fact necessary to constitute the offense charged. *In re Winship*, 397 U.S. 358, 363-64 (1970). The standard for determining if a conviction is supported by sufficient evidence is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

-18-

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 317 (1979).  In making such a determination, a district court may not substitute its own

determination of guilt or innocence for that of the factfinder, nor may it weigh the credibility of

witnesses.  *See id.*; *Walker v. Engle*, 703 F.2d 959, 970 (6th Cir. 1983).  Moreover, federal courts

are required to give deference to factual determinations made in state court and "[a]ny

conflicting inferences arising from the record . . . should be resolved in favor of the prosecution."

*Heinish v. Tate*, 1993 WL 460782 at * 3 (6th Cir. 1993) *citing Walker*, 703 F.3d at 969-70;

*Wright v. West*, 505 U.S. 277, 296 (1992) (the deference owed to the trier of fact limits the

nature of constitutional sufficiency review.)

Consistent with these principles, the Supreme Court recently emphasized that habeas courts

must review sufficiency of the evidence claims with "double deference:"

> We have made clear that *Jackson* claims face a high bar in federal habeas
> proceedings because they are subject to two layers of judicial deference.
> First, on direct appeal, 'it is the responsibility of the jury – not the court–
> to decide what conclusions should be drawn from evidence admitted at
> trial. A reviewing court may set aside the jury's verdict on the ground of
> insufficient evidence only if no rational trier of fact could have agreed
> with the jury.' *Cavazos v. Smith*, 565 U.S. 1, ----, 132 S.Ct. 2, 4, 181
> L.Ed.2d. 311 (2011) (per curiam).  And second, on habeas review, 'a
> federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court
> disagrees with the state court.  The federal court instead may do so only if
> the state court decision was 'objectively unreasonable.'" *Ibid*. (quoting
> *Renico v. Lett*, 559 U.S. ----, ----- , 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678
> (2010)).

*Coleman v. Johnson*, 132 S.Ct. 2060, 2062 (2012).  Under this standard, "we cannot rely simply

upon our own personal conceptions of what evidentiary showings would be sufficient to convince

us of the petitioner's guilt," nor can "[w]e . . . inquire whether any rational trier of fact would

conclude that petitioner . . . is guilty of the offenses with which he is charged." *Brown v. Konteh*,

567 F.3d 191, 205 (6th Cir. 2009).  Rather, a habeas court must confine its review to determining whether the state court "was unreasonable in *its* conclusion that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial." *Id.* (emphasis in original) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)).

First, the state appellate court clearly employed the correct standard in its analysis.  With respect to the aggravated burglary charge, Petefish argues that there was insufficient evidence to support the element of trespassing and also that there was no evidence that he ever "brandished" the knives in his possession.  (ECF No. 1-1 at 12-13.)  The state appellate court thoroughly addressed these arguments and discussed the evidence that supported the conviction for aggravated burglary.  Nonetheless, this Court also reviewed the trial transcripts.  Bette Merrick ("Merrick'), Petefish's ex-wife, testified to the following: (1) she lived in an apartment with her minor daughter from her second marriage during the time period when the crimes were committed; (2) she and her daughter lived there alone; (3) occasionally she would allow Petefish to eat, shower, and sleep at the apartment; (4) in December of 2009 she told Petefish to quit coming to her apartment because of Petefish's drinking, drug abuse, and violent behavior; (5) on December 24, 2009, when Petefish came to her apartment, she told him he had to leave; (6) upon returning to her apartment after visiting her father, she found Petefish there and told him he had to leave; (7) Petefish briefly went outside and she noticed her daughter's cellular phone was missing; (8) she heard a knock at the door and it was Petefish; (9) she asked for the phone back and cracked open the door expecting Petefish to hand her the phone; and, (10) Petefish pushed the door open and entered the apartment.  (ECF No. 6-6, Tr. 341-357.)  This testimony alone was

-20-

sufficient to establish the element of trespass.  Though Petefish claims that he lived at the apartment, the fact that there may have been conflicting evidence in the record does not render the evidence insufficient to establish a trespass.  It is not for this Court to determine the credibility of witnesses, and the jury plainly found Merrick's testimony credible.  As such, there was nothing unreasonable about the appellate court's determination that the element of trespass was satisfied, when viewing the evidence in the light most favorable to the prosecution.

As for Petefish's argument that he never brandished the two knives that he placed in his pocket, the state appellate court determined that brandishing is not a necessary element to the offense, and noted that O.R.C. § 2911.11(A)(2) only requires that the offender have a "deadly weapon or ordnance on or about the offender's person or under the offender's control."  It is well established that "[a] federal habeas court must therefore defer to a state appellate court's construction of the elements of state crimes."  *Riley v. Woods*, 2010 U.S. Dist. LEXIS 81453 at **11-12 (E.D. Mich., Aug. 11, 2010) (*citing Sanford v. Yukins*, 288 F. 3d 855, 862 (6th Cir. 2002); *Coe v. Bell*, 161 F. 3d 320, 347 (6th Cir. 1998)).  As such, this Court cannot second guess the state appellate court's determination that brandishing was not a requisite element. Furthermore, none of the case law cited by Petefish contradicts the state appellate court's determination.  In *State v. Threats*, 1987 Ohio App. LEXIS 7237 (Ohio Ct. App., May 26, 1987), the appellant was not charged with aggravated burglary nor is there any indication he possessed a weapon during the alleged trespass.

This case is also distinguishable from *State v. Parsons*, 2007-Ohio-1204, 2007 Ohio App. LEXIS 1025 (Ohio Ct. App., Mar. 13, 2007).  In *Parson*s, the court found there was no evidence that the defendant inflicted, attempted to inflict, or threatened to inflict physical harm under

-21-

O.R.C. § 2911.11(A)(1).  Petefish contends that he also did not make any threats of physical harm.  (ECF No. 1 -1 at 13.)  However, Petefish was charged and convicted of violating O.R.C. § 2911.11(A)(2), which does not require inflicting, attempting to inflict, or threatening to inflict physical harm.

Finally, Petefish's reliance on *State v. Howard*, 2005-Ohio-5135, 2005 Ohio App. LEXIS 4639 (Ohio Ct. App., Sept. 29, 2005) is also misplaced.  Therein, the appellant's conviction was not vacated because there was no evidence of brandishing, but rather because there was no evidence that his entry into the residence was the product of the use of force, stealth or deception.  *Id*. at ¶¶9-14 (noting that "[i]t has long been established in Ohio that the force element of an aggravated burglary charge can be accomplished through the opening of a closed but unlocked door ... [but] [t]here is no fact here that would allow a jury to infer that the door was closed.")  This relates back to the element of trespass.  As stated above, Merrick testified that Petefish forcefully pushed the door open.

Turning to the abduction conviction, Petefish asserts that there was insufficient evidence to support his conviction for abduction because he never restrained Merrick or her daughter, he never took a knife out of his pocket, Merrick eventually left the apartment of her own accord, and neither Merrick nor her daughter were ever harmed.  (ECF No. 1-1 at 16-17.)  Merrick also testified at trial that, after Petefish forced the door open and entered the apartment, he opened what she characterized as a junk or miscellaneous drawer and retrieved a knife or two which he placed in his pocket.  (ECF No. 6-6, Tr. 356.)  Merrick's daughter also testified that she saw Petefish retrieve two knives from the junk drawer and put them in his pants' pocket.  (ECF No. 6-7, Tr. 402.)  Merrick further testified that she instructed her daughter to pack a bag, that they

-22-

proceeded to the bedroom to do so, and that they expressed their intent to leave the apartment. *Id*. at 355-56.  According to Merrick, Petefish was yelling and screaming and stated that she and her daughter were not going anywhere.  *Id*. at 355.  After retrieving the knives, Merrick indicated that Petefish busted through the bedroom door[4] where she and her daughter were packing, closed the door behind him, and placed his hand across the door.  *Id*. at 355-57.  Merrick testified that Petefish "was standing over me and I directed my daughter to the back of the bed.  I stood in front to protect her, and he was screaming.... calling us names and said you're not going anywhere, I'm not going to allow you."  (ECF No. 6-6, Tr. 357.)  According to Merrick's daughter, Petefish continued to hover over his mother with his hands in his pocket.  (ECF No. 6-7, Tr. 403.)

Merrick could not approximate how long they were in the bedroom, but indicated that it felt like a very long time.  (ECF No. 6-6, Tr. 358, 384-85.)  She stated that she and her daughter were locked in there with Petefish standing in the way.  *Id*. at 385.  When Petefish walked out of the bedroom, Merrick testified that she and her daughter fled from the apartment with great haste.  *Id*. at 359.  Merrick stated that she feared for her and her daughter's immediate safety because Petefish was so irate.  *Id*. at 386.

This testimony is sufficient to allow a rational juror to find the essential elements of abduction were satisfied beyond a reasonable doubt.  Petefish pointing to contradictory evidence is irrelevant.  Furthermore, the fact that Petefish did not remove the knives from his pocket does not nullify evidence of force or threat.  Moreover, while Petefish emphasizes that the two women

---

[4]  Merrick testified that her daughter had closed the bedroom door behind them.  (ECF No. 6-6, Tr. 355.)

left the apartment unharmed, this does not negate the evidence of restraint.  As such, the state

appellate court's determination was neither contrary to nor an unreasonable application of clearly

established federal law.

**B. Ground Two: Ineffective Assistance of Trial Counsel - Witnesses**

In his second ground for relief, Petefish asserts that he was denied his right to effective

assistance of trial counsel due to counsel's failure to investigate or call witnesses that would have

refuted the evidence presented and exonerated him.[5]  (ECF No. 1.)  Specifically, Petefish asserts

that counsel failed to subpoena Kathleen Bailey for trial.  (ECF No. 1-1.)  According to an

affidavit attached to the petition, Ms. Bailey would have testified that in October of 2009,

Merrick, her daughter, and Petefish came to visit her in Hubbard, Ohio.  (ECF No. 1-3, Exh. B.)

She found Merrick and Petefish sleeping in the same room despite separate accommodations

being available and on one occasion Merrick was brought home by the police because she was

too intoxicated to drive.  *Id*.  Petefish also asserts that counsel failed to subpoena James

Romandetti for trial.   (ECF No. 1-1.)  According to an affidavit attached to the petition, Mr.

Romandetti would have testified that he visited Merrick and Petefish at the apartment where the

relevant events occurred and that it was his "understanding" that Merrick and Petefish were co-

habiting at the apartment.  (ECF No. 1-4, Exh. C.)  He further stated that both Petefish and

Merrick became intoxicated during his visit and that Merrick's daughter became visibly upset.

*Id*.

First, to establish ineffective assistance of counsel, a petitioner must demonstrate that his

---

[5]  Petefish did not raise these arguments on direct appeal, but did raise them in a post-
conviction petition and subsequent appeals.

counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668 (1984); *United States v. Bavers*, 787 F.2d 1022 (6th Cir. 1985).  A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair.  *Id.*  To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

"[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.  Mere disagreements by a defendant with tactics or strategies employed by counsel are not enough to support a claim of ineffective assistance of counsel and there is a presumption that the challenged conduct of a petitioner's counsel was a matter of strategy.  *Id.* at 689; *see also United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).

As explained recently by the United States Supreme Court:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S. Ct. 1411, 173 L. Ed. 2d 251.  Federal habeas courts must guard

-25-

against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Harrington v. Richter,* 131 S. Ct. 770, 788 (U.S. 2011); *accord Kennedy v. Warren*, 2011 WL 1642194, *2 (6th Cir. May 3, 2011); *accord Goza v. Welch*, 2012 U.S. Dist. LEXIS 178665 at **24-25 (N.D. Ohio Dec. 18, 2012).

The state appellate court addressed Petefish's arguments as follows:

[*P21]  Under these assignments, appellant complains that counsel did not interview or subpoena Kathleen Bailey and James Romandetti as he requested.  He believes their testimony was outcome-determinative for two reasons: to show that he and Bette lived together and to show that Bette lied when she testified that she did not drink alcohol.

[*P22]  To the contrary, Ms. Bailey's affidavit merely stated that she permitted Bette and appellant to stay at her house for two weeks before Bette moved into an apartment.  It also claimed that she asked them to sleep apart but found them sleeping in the same room.  The affidavit said nothing about whether appellant went on to take up residence at Bette's apartment.

[*P23]  On this topic, Mr. Romandetti's affidavit merely stated that he visited the apartment on one occasion and that it was his "understanding" that they were cohabiting there.  It is within the trial court's discretion to find that a person developing an "understanding" from one visit would not have added a great deal of contradictory weight at trial.  As the trial court pointed out, both appellant and his mother had already testified that appellant lived with Bette in that apartment.  Thus, this affiant's "understanding" would have been merely cumulative of other testimony.

[*P24]  Furthermore, as we stated in our prior opinion, the parties agreed that appellant's name is not on the lease of the newly rented apartment, he did not pay rent, utilities, or make regular contributions to the household, he did not have his own set of keys, he was unable to come and go without making prior arrangements with Bette, he received mail at his mother's house, and he stayed at other places as well.  *Petefish*, 7th Dist. No. 10MA78 at ¶20.  And, a trespass can occur even after lawful entry onto the premises if the privilege to remain has been revoked.  *Id*. at ¶22.

[*P25]  On the topic of whether Bette drinks alcohol, defense counsel asked Bette

-26-

if she drinks.  She responded that she is not a drinker, explaining that it had been months since she last had a drink.  (Tr. 375).  Each affiant claims that he or she saw Bette drunk on one occasion in the fall of 2009.  Yet, this does not actually contradict her April of 2010 testimony that it had been months since she had a drink.  Plus, a person who says they are not a "drinker" may not be lying merely because two people believed they saw her intoxicated one night.  We also note that the affiants did not state how much she drank on these occasions.

[*P26]  In any event, appellant testified at trial, but he did not set forth testimony on Bette's drinking, which he now wants to elicit through the testimony of others, one of whom says that appellant was with Bette when he saw her drink. Finally, whether she drank alcohol was not an outcome-determinative topic. Notably, there is no allegation that she had anything to drink on the night of the incident.

[*P27]  For all of these reasons, appellant failed to show substantive grounds for relief in his petition as prejudice from the failure to call these witnesses is not apparent. These assignments of error are overruled.

*State v. Petefish*, 2012-Ohio-1502, 201 Ohio App. LEXIS 1319 (Ohio Ct. App., Mar. 30, 2012).

The state appellate court expressly noted that the *Strickland* standard governs ineffective assistance of counsel claims.  As this Court construes the decision, the state appellate court's analysis focused on the second prong of the *Strickland* test – namely whether trial counsel's decision not to interview or call the two witnesses resulted in such prejudice as to render Petefish's trial unfair.  *Id*.  The court found that it did not.  In other words, the state appellate court found that Petefish could not demonstrate a reasonable probability that inclusion of the omitted witnesses' testimony would have resulted in a different outcome.  The Court finds nothing unreasonable in this determination.

As thoroughly explained by the state appellate court, neither Mr. Romandetti's "understanding" based on a single visit that Merrick and Petefish were living together nor Ms. Bailey's discovery of the two sleeping in the same room demonstrate that Petefish was living in Merrick's apartment.  As observed by the state appellate court, even if such an inference could be

-27-

made, such testimony would have been cumulative.  With respect to whether Merrick consumes

alcohol with any regularity, the Court finds the statements of Mr. Romandetti and Ms. Bailey to

be of minimal relevance.  As explained by the state appellate court, whether Merrick had ever

been intoxicated was not an outcome-determinative issue and no one has alleged that Merrick

consumed alcohol on the night of the incident.  "A defense counsel has no obligation to call or

even interview a witness whose testimony would not have exculpated the defendant." *Millender*

*v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (citations omitted); *accord Pillette v. Berghuis*, 408

Fed. App'x. 873 (6th Cir. 2010); *Dawkins v. United States*, 2014 U.S. Dist. LEXIS 84744 (E.D.

Tenn. June 23, 2014).

This Court finds nothing unreasonable about the appellate court's determination that

counsel was not ineffective under *Strickland* 's deferential standard due to the lack of any

prejudice.

**C.    Ground Three: Ineffective Assistance of Trial Counsel - Impaired Abilities**

In his third ground for relief, Petefish again alleges ineffective assistance of trial counsel.

(ECF No. 1-1 at 28-34.)  Unlike his previous ground for relief, which focused on counsel's

alleged lack of pre-trial investigation and the decision not to call two witnesses, this ground

alleges that trial counsel, due to a recent diagnosis of diabetes, was lethargic, apathetic, dazed,

and "nodded off" during trial.[6]  (ECF No. 1-1 at 28-34.)

The *Strickland* standard applies to this claim as well.  The Sixth Circuit, interpreting

Supreme Court precedent, has explained as follows:

---

[6]  Again, Petefish did not raise this argument on direct appeal, but did raise it in a post-
conviction petition and subsequent appeals.

-28-

In *Strickland*, the Supreme Court held that in order to successfully claim a lawyer's assistance was so ineffective as to violate the Sixth Amendment a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687.  "Second, the defendant must show that the deficient performance prejudiced the defense."  *Id*. In *Cronic*, however, the Supreme Court held there are circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified" and prejudice is presumed.  466 U.S. at 658.  The "[m]ost obvious" of these circumstances is "the complete denial of counsel."  *Id*. at 659.  Where the defendant "is denied counsel at a critical stage of his trial," we are required "to conclude that a trial is unfair," and an independent showing of prejudice is not required.  *Id*.

The Ninth, Fifth, and Second Circuits have all considered the question of when sleeping by trial counsel becomes the effective denial of counsel and "so likely . . . prejudice[s] the accused" that *Cronic* applies and prejudice is presumed.  All of these circuits have held that the denial of counsel with presumed prejudice only occurs once counsel sleeps through a "substantial portion of [defendant's] trial." *Javor v. United States*, 724 F.2d 831, 834 (9th Cir. 1984); *see also Burdine v. Johnson*, 262 F.3d 336, 340-41 (5th Cir. 2001) (*en banc*) (concluding a defendant's right to counsel was violated where defense counsel was "repeatedly unconscious through not insubstantial portions of the defendant's capital murder trial"); *Tippins v. Walker*, 77 F.3d 682, 685 (2d Cir. 1996) (holding the defendant's right to counsel was violated where defense counsel was asleep for "numerous extended periods of time").

*Muniz v. Smith*, 647 F.3d 619, 623 (6th Cir. 2011).

The state appellate court addressed Petefish's argument as follows:

[*P30]  Appellant attached an online newspaper article to his affidavit in support of post-conviction relief.  The article outlined his trial attorney's behavior in another defendant's case occurring the week after appellant's trial.  The article stated that a mistrial was declared because the attorney, who was sitting second-chair, fell asleep during jury selection.  The article reported that the attorney explained to the court that his blood sugar must have plummeted and that he had recently been diagnosed with diabetes and was taking medications that can make him fall asleep.  To tie this article to his case, appellant's affidavit stated in pertinent part:

[*P31] "40) That counsel appeared lost, dazed, and confused prior to, during and after trial;

[*P32] "41) That I repeatedly asked counsel what was wrong, and he said nothing,

-29-

although he kept nodding off during short intervals." Footnote 1

FOOTNOTES

1 Appellant's brief relates other facts not presented to the trial court about other
proceedings involving his attorney.  However, these other proceedings cannot be
viewed and used in support of a petition for first the first time on appeal.  *See State
v. Ishmail*, 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (defendant cannot add
matter to record that was not in the record before the trial court).

[*P33]  As the trial court pointed out, appellant's affidavit does not actually claim
that trial counsel fell asleep during appellant's trial.  Rather, the trial court
believed that it merely suggested that counsel almost fell asleep during breaks or
intervals in the trial.

[*P34]  In any event, the trial judge who ruled on appellant's post-conviction
petition was the same judge who presided over appellant's trial.  *See Calhoun*, 86
Ohio St.3d at 284-285 (the trial court can assess the credibility of affidavits,
especially where he presided at trial and the claims deal with behavior at trial).
This judge stated that there was no indication that counsel fell asleep at appellant's
trial. *See* Sept. 9, 2011 Second Amended Judgment Entry, p.4.  This judge could
also evaluate whether trial counsel seemed lost, dazed, or confused at trial.

[*P35]  And, these claims do not specifically allege an instance of ineffective
assistance of counsel as the petitioner must reveal what particular act or omission
occurred that constituted a deficiency (*e.g.* failure to object or failure to properly
cross-examine) and explain how that deficiency prejudiced the defense.  In his
direct appeal, he did not allege any instances of ineffective assistance of counsel
that occurred on the record.  *See Petefish*, 7th Dist. No. 10MA78, 2011 Ohio 6367.
Appellant pointed to no manifestation of confusion during counsel's *voir dire*,
opening statements, cross-examination of the state's witnesses, motion for
acquittal, direct examination of the defense witnesses, or closing argument.

[*P36]  Nor does appellant's petition allege a specific instance that occurred off
the record, besides the failure to subpoena the two affiants, whose potential
testimony was addressed *supra*.  Thus, there is no indication that the trial court
abused its discretion in determining that substantive grounds for relief were not
sufficiently presented to warrant a hearing.

*Petefish*, 2012-Ohio-1502.

Petefish's petition for post-conviction relief, filed with the trial court, attached his personal

affidavit dated January 10, 2011.  In pertinent part, Petefish stated that his trial counsel "appeared

lost, dazed and confused prior to, during and after trial" and he also averred that counsel "kept nodding off during short intervals."  (ECF No. 6-22, Exh. 19.)  There is no indication that Petefish's counsel slept through substantial portions of the trial.  To the contrary, the state courts found that, at most, Petefish merely suggested that counsel almost fell asleep.  The trial judge ruling on the post-conviction petition found that "there is no evidence that trial counsel fell asleep."  (ECF No. 6-33, Exh. 30.)  Furthermore, the state appellate court found that Petefish failed to identify any prejudice that ensued from counsel's alleged impairment.

Habeas relief is only appropriate under the AEDPA if under §2254(d)(1) the state court's decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or, under §2254(d)(2) if the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Before the state court, the only evidence submitted was Petefish's January 10, 2011 affidavit and an online news article indicating that defense counsel had fallen asleep during jury selection in a different trial one week after Petefish was convicted.  Based solely upon this evidence and given the substantial deference given to state court decisions, the Court cannot find that the state court's determination – that trial counsel was not ineffective under *Strickland* – was contrary to, or involved an unreasonable application of, clearly established federal law.  Neither Petefish's affidavit nor the newspaper article concerning the different case conclusively establishes  "the complete denial of counsel," which the Sixth Circuit has construed as trial counsel sleeping through a "substantial portion" of the trial.  The Court also cannot find that the state court's determination of the facts ***in light of the evidence presented in the State court*** was unreasonable.  As noted by the state appellate court, the trial

court judge that presided over Petefish's trial found there was no evidence that counsel fell asleep during Petefish's trial.  Petefish's January 2011 affidavit did not affirmatively allege counsel actually fell asleep for any meaningful length of time, nor was it unreasonable for the state court to decline to draw the inference from the later online news article that trial counsel must have slept through Petefish's trial as well.

In an affidavit attached to his traverse and dated December 13, 2012, Petefish avers that his trial counsel was in a "catatonic state" which would advance at times into "outright napping, where he appeared confused when roused."  (ECF No. 8-1, Exh. W-1.)  This affidavit, however, cannot have been part of the state court record as it post-dates the Supreme Court of Ohio's July 5, 2012 decision denying his appeal related to his post-conviction petition.  (ECF No. 6-46, Exh. 43.)  In fact, it even post-dates the Supreme Court of Ohio's September 26, 2012 decision denying Petefish's appeal related to his Rule 26(B) application.  (ECF No. 6-54, Exh. 51.) Petefish contends that a federal habeas court may consider evidence not presented before the state courts.  (ECF No. 8 at 9.)  He further asks this Court hold an evidentiary hearing.  *Id*. at 13. Petefish's request runs contrary to a decision of the United States Supreme Court:

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time--*i.e.*, the record before the state court.
>
> This understanding of the text is compelled by "the broader context of the statute as a whole," which demonstrates Congress' intent to channel prisoners' claims first to the state courts.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997).  "The federal habeas scheme leaves primary responsibility with the state courts . . . ."  *Visciotti*, *supra*, at 27, 123 S. Ct. 357, 154 L. Ed. 2d 279.  Section 2254(b) requires that prisoners must ordinarily

exhaust state remedies before filing for federal habeas relief.  It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*.

Limiting § 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision.  Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did.  State-court decisions are measured against this Court's precedents as of "the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  To determine whether a particular decision is "contrary to" then-established law, a federal court must consider whether the decision "applies a rule that contradicts [such] law" and how the decision "confronts [the] set of facts" that were before the state court.  *Williams v. Taylor*, 529 U.S. 362, 405, 406, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (Terry Williams).  If the state-court decision "identifies the correct governing legal principle" in existence at the time, a federal court must assess whether the decision "unreasonably applies that principle to the facts of the prisoner's case."  *Id.*, at 413, 120 S. Ct. 1495, 146 L. Ed. 2d 389.  It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-1399 (U.S. 2011) (footnotes omitted).

The availability of an evidentiary hearing in a federal habeas action is limited by the AEDPA to circumstances where the following criteria is satisfied:

(e)(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

-33-

28 U.S.C. § 2254(e)(2).

In addition, a federal habeas court's ability to consider evidence that was not presented to a state courts or evidence that was developed during an evidentiary hearing is further circumscribed by the Supreme Court's above cited decision in *Pinholster*.  The Sixth Circuit has explained as follows:

> Based on the United States Supreme Court's decision in *Pinholster*, the district court erred in granting Ballinger an evidentiary hearing on his ineffective-assistance-of-counsel claim.  In *Pinholster*, the Court explained that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  *Id*. at 1400.  Accordingly, district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue. *See id*; *Atkins v. Clarke*, 642 F.3d 47, 49 (1st Cir. 2011).

*Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *see also Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) ("Because the state court considered Bourne's ineffectiveness argument on the merits, however, Bourne is stuck with 'the record that was before the state court.'"); *Sheppard v. Bagley*, 657 F.3d 338, 344 (6th Cir. 2011) (finding testimony taken during a federal evidentiary hearing was taken in violation of § 2254(e)(2) and refusing to consider it).

Petefish cannot reasonably maintain that the state court's decision concerning his ineffective assistance of counsel claim did not constitute an "adjudication on the merits."  In *Loza v. Mitchell*, 766 F.3d 466 (6th Cir. 2014), the Sixth Circuit found that a petitioner's claim was adjudicated on the merits in state court despite the state court's decision not to hold an evidentiary hearing.  As explained by the *Loza* court, where a federal claim has been presented to a state court, and the state court has denied relief without any indication that is relying on state-law procedural principles, "it may be presumed that the state court adjudicated the claim on

-34-

the merits ...”[7]  *Id.*, *quoting Harrington*, 131 S. Ct. at 784-85.  As Petefish would not be allowed to rely on evidence collected during an evidentiary hearing to show a violation of § 2254(d)(1) where the state court adjudicated his claim on the merits, holding an evidentiary hearing would be a wasteful endeavor.  *See, e.g., Blevins v. Warden, Ross Corr. Inst.*, 2011 WL 6141062 at *4 (S.D. Ohio, Dec. 9, 2011) (“There cannot be good cause to collect evidence which cannot be presented.”)  In addition, considering evidence not presented to the state court or evidence elicited at a federal evidentiary hearing would also be inappropriate when considering whether the state court’s decision violated § 2254(d)(2), as that section, by its express language, requires the Court to consider whether a decision was based on an unreasonable determination of the facts based on “evidence presented *in the State court proceeding*.”  28 U.S.C. § 2254(d)(2) (emphasis added).

For the reasons stated above, the Court finds Petefish’s third ground for relief to be without merit and further finds that an evidentiary hearing is not warranted.

**D.  Ground Four: Ineffective Assistance of Appellate Counsel**

In his final ground for relief, Petefish asserts that his appellate counsel was ineffective when he failed to argue that the convictions were allied offenses which should have merged for sentencing.  (ECF No. 1.)  Petefish fails to include any supporting facts in his petition.  Petefish’s memorandum of law in support of his petition fails to address this final ground for relief, nor

---

[7]  The trial court, when denying Petefish’s post-conviction petition, specifically found that he failed to establish ineffective assistance of trial counsel pursuant to *Strickland*, and there is no indication that the petition was being denied pursuant to any state procedural rule.  (ECF No. 6-33, Exh. 30.)  The state appellate court affirmed the finding that Petefish failed to establish ineffectiveness of counsel.  The state court’s decisions, therefore, were adjudications on the merits.

does his traverse. (ECF Nos. 1 & 8.) Thus, Petefish arguably has abandoned this claim.[8]

Even if Petefish's fourth ground for relief is not deemed waived, it is, nonetheless, without merit. To prove ineffective assistance of appellate counsel, the claimant must show a level of deficient performance that is prejudicial to the defendant under *Strickland*. *See Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993). Counsel must provide reasonable professional judgment in presenting the appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396–97, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), *quoting Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Failure to raise "significant and obvious" issues on appeal can constitute ineffective assistance of appellate counsel. *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999). "[No] decision of this Court suggests ... that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. at 750–54; *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990) (tactical choices are properly left to the sound professional judgment of counsel). Of course, not every decision made by appellate counsel can be insulated

---

[8] It is not this Court's function to find law or evidence to support Petefish's undeveloped and conclusory "argument." *See, e.g., McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (citations omitted); *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.")

from review merely by categorizing it as strategic.  The Sixth Circuit has identified the following factors to be considered in determining whether counsel on direct appeal performed competently:

    A. Were the omitted issues "significant and obvious?"

    B. Was there arguably contrary authority on the omitted issues?

    C. Were the omitted issues clearly stronger than those presented?

    D. Were the omitted issues objected to at trial?

    E. Were the trial court's rulings subject to deference on appeal?

    F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

    G. What was appellate counsel's level of experience and expertise?

    H. Did the petitioner and appellate counsel meet and go over possible issues?

    I. Is there evidence that counsel reviewed all the facts?

    J. Were the omitted issues dealt with in other assignments of error?

    K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427–28 (6th Cir. 1999).  This list is not exhaustive and need not produce a certain "score."  *Id*. at 428.  Lastly, failure of appellate counsel "to raise an issue on appeal is ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal."  *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005), *citing Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001).

    The state appellate court addressed Petefish's claim as follows:

    [*P2]  We are now presented with Appellant's timely application to reopen his appeal and the state's opposition to the application.  Appellant contends that he received ineffective assistance of counsel because appellate counsel did not argue that the offenses were allied.  Appellant does not identify which offenses he

believes are allied.  The state, in opposition to Appellant's application, assumes that Appellant is arguing that his convictions for aggravated burglary and abduction should be "merged pursuant to R.C. 2941.25."  The state argues that even if Appellant may have been entitled to a sentence modification based on merger, he has not shown that the alleged failure on the part of appellate counsel provides the grounds to reopen.  In the alternative, the state also argues that aggravated burglary and abduction are not allied offenses and therefore counsel's performance was not deficient.

[*P3]  Appellate Rule 26(B) governs applications for reopening.  The rule provides in pertinent part, "[a] defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel."  App.R. 26(B)(1).  The defendant seeking to reopen must also provide "[o]ne or more assignments of error * * * that previously were not considered on the merits in the case by any appellate court or that were considered on an incomplete record because of appellate counsel's deficient representation."  App.R. 26(B)(2)(c).  The applicant must also provide a "sworn statement of the basis for the claim that appellate counsel's representation was deficient with respect to the assignments of error * * * and the manner in which the deficiency prejudicially affected the outcome of the appeal."  App.R. 26(B)(2)(d).

[*P4]  To justify reopening his appeal, Appellant "bears the burden of establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of ineffective assistance of counsel on appeal."  *State v. Spivey*, 84 Ohio St.3d 24, 25, 1998 Ohio 704, 701 N.E.2d 696 (1998), *accord State v. Sheppard*, 91 Ohio St. 3d 329, 2001 Ohio 52, 744 N.E.2d 770 (2001).  "The two-pronged analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess whether [Appellant] has raised a 'genuine issue' as to the ineffectiveness of appellate counsel in his request to reopen under App. R. 26(B)."  *Sheppard* at 330.  To prevail on a claim of ineffective assistance of counsel Appellant must show not only that counsel's performance was deficient, but also that he was prejudiced by that deficiency.  *Strickland*, *supra*, at 668; *see also State v. Williams*, 99 Ohio St.3d 493, 2003 Ohio 4396, 794 N.E.2d 27, ¶107.  "Deficient performance" means performance falling below an objective standard of reasonable representation.  "Prejudice," in this context, is defined as a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  *Strickland* at 687-688, 694.  Moreover, in evaluating the performance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id* at 690-691.  In support of an application for reopening Appellant must "prove that his counsel [was] deficient for failing to

-38-

raise the issues he now presents and that there was a reasonable probability of success had he presented those claims on appeal." *Sheppard*, *supra*, at 330, *citing State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

[*P5] "Allied offenses" are defined in R.C. 2941.25, which provides in part: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). Determining whether offenses are allied within the meaning of the statute involves a two-step process. A court must first decide whether, when the elements of the two crimes are compared, the elements "correspond to such a degree that the commission of one crime will result in the commission of the other." *State v. Rance*, 85 Ohio St.3d 632, 638, 1999 Ohio 291, 710 N.E.2d 699 (1999) (reversed on other grounds). When conducting this analysis a court must consider both the elements of the offenses and the conduct of the accused. *State v. Johnson*, 128 Ohio St.3d 153, 2010 Ohio 6314, 942 N.E.2d 1061, paragraph 1 of the syllabus (explicitly overruling paragraph one of the syllabus in *State v. Rance*, *supra*, which provided that the statutorily defined elements of offenses would be compared in the abstract, without reference to the conduct of the accused, and holding that two offenses were "allied under R.C. 2941.25 because the same conduct constituted the commission of two offenses of similar import under the facts" of the case. *Id*. at ¶9).

[*P6] Appellant was charged on three counts: one count of aggravated burglary and two counts of abduction, one with regard to Bette and the second with regard to Melissa, a minor. Aggravated burglary, a violation of 2911.11(A)(2)(B), occurs when a defendant has trespassed in an occupied structure (as defined by R.C. 2909.01(C)) while in possession of a deadly weapon or ordnance in violation of R.C. 2923.11, and is a first degree felony. Ohio Revised Code Section 2911.11 provides, in part: No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply * * * (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

[*P7] Pursuant to R.C. 2923.11, a deadly weapon is defined as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

[*P8] Abduction is a violation of R.C. 2905.02(A)(2) and (C), which states: "No person, without privilege to do so, shall knowingly do any of the following: * * * (2) By force or threat, restrain the liberty of another person under circumstances

-39-

that create a risk of physical harm to the victim or place the other person in fear; * * * (C) Whoever violates this section is guilty of abduction * * * a felony of the third degree."

[*P9]  There is no correspondence between the elements of aggravated burglary and abduction, they are wholly separate crimes and there is no instance in which "the commission of one crime will result in the commission of the other." *Rance*, supra, at 638.  Even considering the specific conduct of Appellant with regard to each offense, as described in detail by us in the underlying Opinion in this matter, there is no overlap between the two offenses.

[*P10]  With regard to the two counts of abduction, one count involving Bette, and one count with regard to Melissa, although the conduct satisfying the elements of each crime overlaps to a degree, each count and each conviction identifies a different victim.  Committing the same crime, even simultaneously, with regard to different victims does not result in merger pursuant to R.C. 2941.25.  Appellant was convicted of three separate crimes, the first a first degree felony, and the second and third, both third degree felonies with different victims.  Different crimes with different penalties and different victims are not allied offenses.  Appellant was in no way prejudiced by the fact that appellate counsel did not raise an argument that had no chance of success.  Based on the record before us, appellate counsel's performance was not deficient.

[*P11]  Appellant received effective assistance of counsel in his appeal and there was no reasonable probability of success had counsel argued Appellant was convicted of allied offenses.  Accordingly Appellant's application for reopening is denied.

*State v. Petefish*, 2012-Ohio-2723, 2012 Ohio App. LEXIS 2390 (Ohio Ct. App., Jun. 13, 2012).

The appellate court plainly employed the correct legal standard in addressing Petefish's ineffective assistance of appellate counsel claim.  The state appellate court unequivocally found that aggravated burglary and abduction were not allied offenses of similar import under Ohio law.  As such, Petefish cannot demonstrate that there was a reasonable probability that inclusion of the issue would have changed the result of the appeal.  Even if it is Petefish's position that the state appellate court's decision was incorrect as to the issue of allied offenses, this Court simply cannot overrule a state court's interpretation of state law.  *See, e.g., Vroman v. Brigano*, 346 F.3d 598,

604 (6th Cir. 2003) ("Federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state."); *Volpe v. Trim*, 708 F.3d 688, 697 (6th Cir. 2013) ("[w]hen assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes.") (citations omitted).  Moreover, the state appellate court's decision is consistent with another Ohio appellate decision, *State v. Moore*, 2011-Ohio-636, 2011 WL 497480 (Ohio Ct. App. Feb 11. 2011), wherein the court declined to merge appellant's convictions for sentencing for burglary and abduction.  The *Moore* court explained that "[t]he burglary was complete when Moore entered [the victim's] home; his subsequent restraint of her liberty was a separate offense."  *Id*. at ¶56.  Here, Petefish's commission of the offense of aggravated burglary was complete when he forced his way into Merrick's apartment while having a deadly weapon on his person or under his control.  Had he left the apartment at that point, there would have been no abduction.  However, Petefish proceeded to the bedroom wherein he closed the bedroom door and restrained Merrick and her daughter of their liberty under circumstances that placed them in fear.  These separate, latter actions resulted in the abduction conviction.

Therefore, Petefish's claim that appellate counsel was ineffective for failing to argue that his sentences should have merged as allied offenses of similar import is without merit.

### IV.  Conclusion

For the foregoing reasons, it is recommended that Petefish's Petition be DENIED.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: November 3, 2014

-41-

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).